UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOYCE E. BALDOCK, | ) |
|     *Plaintiff*, | ) |
|     vs. | )  1:12-cv-01639-JMS-TAB |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security, | ) |
|     *Defendant*. | ) |

**ENTRY REVIEWING THE COMMISSIONER'S DECISION**

Plaintiff Joyce Baldock applied for Supplemental Security Income Benefits ("SSI") through the Social Security Administration ("SSA") in January 2010. [R. 116-21, 181; dkt. 12-5 at 2-7; dkt. 12-6 at 44.] After a series of administrative proceedings and appeals, including a hearing in June 2011 before Administrative Law Judge ("ALJ") William M. Manico, [R. 28-39; dkt. 12-2 at 29-40], where vocational expert Stephanie R. Archer testified, the Commissioner denied her application, [R. 10-21; dkt. 12-2 at 11-22]. The Appeals Council denied Ms. Baldock's timely request for review of the ALJ's decision, [R. 1-6; dkt. 12-2 at 2-7], rendering that decision the final one for the purposes of judicial review. 20 C.F.R. § 404.981. Ms. Baldock then filed this action under 42 U.S.C. §§ 405(g), 1383(c)(3), requesting that the Court review the ALJ's denial. [Dkt. 14 at 1.]

**BACKGROUND**

**A. Age, Education, Family, and Work History**

Ms. Baldock was born on October 4, 1974, [R. 122; dkt. 12-5 at 8], and has alleged disability beginning in June 1980, [R. 116; dkt. 12-5 at 2]. Ms. Baldock received SSI benefits from age 15 until age 23; she reported that she received these benefits due to a mild mental

1

handicap. [R. 31, 157, 240; dkt. 12-2 at 32, 12-6 at 20, 12-7 at 56.] She lost her benefits when she got married. [R. 21; dkt. 12-2 at 32, 12-6 at 20.] She has an eighth grade education and was enrolled in special education classes. [R. 28; dkt. 12-2 at 29.] Ms. Baldock has two children, who were removed from her custody by child protective services in 2008. [R. 240; dkt. 12-7 at 56.][1]

She has never held a job for more than six months. [R. 29; dkt. 12-2 at 30.] Her prior jobs range from employee at Church's Chicken, [*id.*], to restaurant stocker, [R. 167; dkt. 12-6 at 30].[2] She earned no more than $659.49 per year between 1993 and 1996. [R. 123; dkt. 12-5 at 9.] She had no earnings between 1997 and 2008. [R. 123; dkt. 12-5 at 9.] She earned $734 in 2009 and nothing in 2010 or 2011. [*Id.*]

### B. Medical Evidence and Disability Reports

Ms. Baldock completed IQ tests three times as a child and once as an adult. [R. 187, 193-94, 197; dkt. 12-7 at 3, 9-10, 13.]

| Year; age | VIQ | PIQ | FSIQ |
|---|---|---|---|
| 1984; age 9[3] | 73 | 85 | 77 |
| 1989; age 15[4] | 58 | 74 | 64 |
| 1990; age 15.5[5] | 60 | 73 | 65 |
| 2004; age 29[6] | 69 | 78 | 71 |

---

[1] The record is unclear as to whether this was due to her marijuana use, [R. 227; dkt. 12-7 at 43], or the fact that her then-12-year-old son weighed 40 pounds when she brought him in for a checkup, [R. 325; dkt. 12-8 at 56].

[2] Ms. Baldock self-reported that she worked as a restaurant stocker eight hours a day, five days a week, for three years. [R. 167; dkt. 12-6 at 30.] However, her DISCO Insured Status Report indicates that she never earned more than $659.49 per year during those years that she self-reported full-time employment. [R. 123; dkt. 12-5 at 9.]

[3] [R. 197; dkt. 12-7 at 13.]

[4] [R. 197; dkt. 12-7 at 13.]

[5] [R. 193-94; dkt. 12-7 at 9-10.]

[6] [R. 187; dkt. 12-7 at 3.]

Based on the results of her last IQ test, administered by Dr. Paula Michelle Gardner, PsyD, Dr. Gardner reported that Ms. Baldock was within the "Borderline range of intelligence." [R. 188; dkt. 12-7 at 4.] Dr. Gardner noted that because Ms. Baldock's VIQ score was in the intellectually disabled[7] range, she would likely have difficulty with verbal instructions, supervision, and interpersonal relationships. [*Id.*] Dr. Gardner opined that these difficulties "will likely" interfere with her work performance. [*Id.*] During this last evaluation, Ms. Baldock also reported experiencing emotional health issues including depression and feelings of isolation. [R. 186-87; dkt. 12-7 at 2-3.] Ms. Baldock noted that she was "trying to get pills because I'm depressed," but she could not afford the pills and was not covered by Medicaid. [*Id.*]

In 2010, Dr. Benetta Johnson, PhD, completed a mental residual functional capacity assessment and psychiatric review technique form, [R. 206-23; dkt. 12-7 at 22-39.], based on her review of all relevant evidence in Ms. Baldock's case record. *See* 20 C.F.R. § 416.945. She noted three sets of IQ scores: those from 1990 (VIQ: 60; PIQ: 73; FSIQ: 65), those from 2004 (VIQ: 69; PIQ: 78; FSIQ: 71), and another set from 2008 (VIQ: 70; PIQ: 81; FSIQ: 74). [R. 208; dkt. 12-7 at 24.] The third set from 2008 does not appear elsewhere in the administrative record.

---

[7] According to the American Association on Intellectual and Developmental Disabilities, "[t]he term Intellectual Disability covers the same population of individuals who were diagnosed previously with Mental Retardation in number, kind, level, type, duration of disability, and the need of people with this disability for individualized services and supports. Furthermore, every individual who is or was eligible for a diagnosis of Mental Retardation is eligible for a diagnosis of Intellectual Disability. While Intellectual Disability is the preferred term, it takes time for language that is used in legislation, regulation, and even for the names of organizations, to change." American Association on Intellectual and Developmental Disabilities, FAQ on Intellectual Disability, http://www.aaidd.org/content_104.cfm (last accessed on June 14, 2013). The Court will use the term "intellectual disability" to refer to the condition widely known as "mental retardation."

Dr. Johnson reported that Ms. Baldock had an IQ score that qualified under Listing 12.05.[8]  [R. 214; dkt. 12-7 at 30.]

Dr. Johnson also reported that Ms. Baldock was "not significantly limited" in her abilities to understand, remember, and carry out "very short and simple instructions," interact appropriately with the general public and with any supervisors or coworkers, and maintain punctuality, attendance, and a regular schedule.  [R. 206-7; dkt. 12-7 at 22-23.]  Dr. Johnson reported that Ms. Baldock was "moderately limited" in her abilities to understand, remember, and carry out detailed instructions, "maintain attention and concentration for extended periods," and "respond appropriately to changes in the work setting."  [*Id.*]  She also noted that Ms. Baldock's report "appears credible."  [R. 208; dkt. 12-7 at 24.]

### C. Psychological Health Assessments

Between 2010 and 2011, Ms. Baldock visited Dr. Aaron P. Kalinowski, [R. 226-28; dkt. 12-7 at 42-44], Dr. Carol Dellinger, and psychotherapist Peter Wiethe,[9] [R. 311-12, 318, 324-26; dkt. 12-8 at 42-43, 49, 55-57], for assistance with her emotional health issues, which included anxiety and depression.  Dr. Kalinowski diagnosed her with depression when she came in for an appointment on July 1, 2010.  [R. 227-28; dkt. 12-7 at 43, 44.]  He also noted her history of rape and prescribed her Zoloft.  [*Id.*]  At her March 7, 2011 appointment with Dr. Dellinger, the doctor diagnosed her with depression, prescribed her Paxil, and scheduled her for a follow-up to be completed two months later.  [R. 316; dkt. 12-8 at 47.]  Dr. Dellinger also noted that Ms.

---

[8] Listing 12.05 requires one VIQ, PIQ, or FSIQ score of 60 through 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." [R. 214; dkt. 12-7 at 30.]

[9] Dr. Dellinger referred Ms. Baldock to Mr. Weithe for therapy.  [R. 311; dkt. 12-8 at 42.]

4

Baldock was not on depression medications because "usually they didn't help, but [she] was on something in [the] past that did help but then got really stressed out and stopped." [*Id.*]

At her appointment with Peter Weithe on April 21, 2011, Mr. Wiethe diagnosed her with post-traumatic stress disorder and major depression. [R. 312, 325; dkt. 12-8 at 43, 56.] Mr. Wiethe also reported that Ms. Baldock was sexually molested at age two and raped at age 15. [*Id.*] Mr. Weithe observed that Ms. Baldock's mood at the appointment was "depressed, anxious, and sad" and "tearful at times." [R. 312; dkt. 12-8 at 43.] Mr. Weithe alleged that Ms. Baldock had "extreme limitations"[10] in her ability to perform the following "work-related mental activities:" 1) "understand and remember simple instructions," 2) "carry out simple instructions," 3) "make judgments on simple work-related decisions," 4) "understand and remember complex instructions," 5) "carry out complex instructions," and 6) "make judgments on complex work-related decisions." [R. 342; dkt. 12-8 at 55.] Mr. Weithe noted that Ms. Baldock had not been to therapy "for quite some time," [*id.*], which Dr. Dellinger reported in her Progress Notes was "due to insurance issues."[11] [R. 315; dkt. 12-8 at 46.]

## DISCUSSION

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the Commissioner's) findings. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation

---

[10] "Extreme" is defined as "a major limitation in this area. There is no useful ability to function in this area." [R. 324; dkt. 12-8 at 55.]

[11] Additionally, mental status exam notes from July 20, 2010 indicated that Ms. Baldock's GAF was 55. [R. 246; dkt 12-7 at 62.] A GAF score is a numerical assessment of psychological, social, and occupational functioning. The scale is 1-100. A GAF score in the range of 51-60 indicates "moderate symptoms…or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed., Text Revision 2000).

omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation omitted). Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), the Court must afford the ALJ's credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) (citations omitted). If the ALJ committed no legal error and substantial evidence exists to support the ALJ's decision, the Court must affirm the denial of benefits. Otherwise the Court must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

To evaluate a disability claim, an ALJ must use the following five-step sequential inquiry:

> (1) [is] the claimant … currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment … one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, …can [she] perform her past relevant work, and (5) is the claimant … capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted). At Step Three, the ALJ must determine whether the claimant's impairment (1) satisfies the criteria or is the medical equivalent of a listed impairment, *see* 20 C.F.R. Pt. 404, Subpt. P, App. 1; 20 C.F.R. 416.920(d), 416.925, and 416.926, and (2) meets the duration requirement, *see* 20 C.F.R. 416.909. If the ALJ determines that the impairment satisfies both considerations under Step Three, the claimant is disabled.

### 1. Requirements under Listing 12.05

The principal issue and the only issue the Court must discuss is Ms. Baldock's claim that she is intellectually disabled.[12] The listing for intellectual disability[13] is 12.05, and it contains an initial paragraph which lays out the diagnostic description of intellectual disability plus four sets of criteria (paragraphs A through D). *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 A. A claimant filing under 12.05 must have an impairment that both meets the diagnostic description of intellectual disability and also meets any one of the four sets of criteria. *See Adkins v. Astrue*, 226 Fed.Appx. 600, 605 (7th Cir. 2007) (citing 20 C.F.R. Pt. 404, Subpt. P., App. 1 § 12.05; *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999)).

Ms. Baldock specifically claims that she qualifies for SSI under Listing 12.05(C). [Dkt. 14 at 5-6.] The 7th Circuit summarizes the requirements for a finding of intellectual disability under Listing 12.05(C) as follows: "(1) significantly subaverage general intellectual functioning; (2) deficits in adaptive functioning initially manifested during the developmental period before age 22; (3) a valid verbal, performance, or full scale IQ of sixty through seventy; and (4) a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Adkins* 226 Fed.Appx. at 605 (citations omitted). The term "deficits in adaptive functioning," the second of the four requirements, "denotes inability to cope with the challenges of ordinary everyday life." *Novy v. Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) (citing American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Text Revision (DSMIV–TR)* 42 (4th ed.2000)).

---

[12] Again, though Listing 12.05 is denoted "Mental Retardation," the Court chooses to refer to the listing per the term "intellectual disability," as suggested by the American Association on Intellectual and Developmental Disabilities.

[13] *Id.*

### 2. Challenges to the ALJ's Step Three Analysis

Ms. Baldock claims the ALJ committed various errors at Step Three of the disability evaluation, when he determined that the record did not establish that Ms. Baldock is intellectually disabled. [Dkt. 14 at 5-6.] Generally, Ms. Baldock alleges the ALJ improperly concluded that Ms. Baldock does not meet Listing 12.05(C). [*Id.*] Specifically, Ms. Baldock raises the issues of whether the ALJ erred in the following ways. First, Ms. Baldock argues that the ALJ erred in his consideration of Ms. Baldock's IQ scores, given that he mistakenly credited a set of IQ scores to Ms. Baldock that do not exist elsewhere in the record. Second, she contends the ALJ improperly relied upon the opinion of Dr. Johnson in determining that Ms. Baldock did not meet Listing 12.05(C) because Dr. Johnson considered same set of IQ scores not elsewhere in the record when forming her opinion. Third, she argues the ALJ improperly assigned little weight to Mr. Weithe's opinion because that determination was based in part on the comparison of Mr. Weithe's opinion to the non-existent set of IQ scores. Fourth, she argues the ALJ erred when he did not explicitly consider all factors that must be considered in a 12.05(C) determination. [*Id.*] Because the Court finds cause to remand under Ms. Baldock's initial challenge regarding the ALJ's consideration of her IQ, and because that error will likely impact each of the additional challenges on remand, the Court does not reach her other challenges.

### 3. The ALJ's Consideration of the Mistaken IQ Scores was not Harmless Error

Ms. Baldock argues that the ALJ erred in his consideration of her IQ scores. [Dkt. 14 at 6.] Specifically, she claims that the ALJ relied on a set of IQ scores that he mistakenly attributed to Ms. Baldock which do not appear elsewhere in the record. [*Id.*] The Commissioner agrees that the ALJ erred in considering a set of IQ scores not elsewhere in the record. The Commissioner suggests that the error was "de minimis," [dkt. 20 at 10], which the Court finds to

8

be a mischaracterization of the extent of the mistake.  The ALJ's decision rested heavily on the non-existent IQ scores, and the Court cannot conclude his opinion would have been the same had the mistake been known.

"If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time."  *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010).  However, the Court is not confident that the ALJ would reinstate his decision on remand, if he were to reconsider the record less the non-existent IQ scores.  Instead, the Court believes there is a reasonable probability the ALJ would reach a different conclusion.  "[T]he fact that the administrative law judge, had [he] considered [an accurate] record, might have reached the same result does not prove that [his] failure to consider [accurate] evidence was harmless. Had [he] considered it carefully, [he] might well have reached a different conclusion."  *Id.*

### a.  The Bridge Between the Evidence and the Conclusion is not "Accurate"

When considering a claimant's case record, "the ALJ is not required to mention every piece of evidence" on the record.  *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  However, the ALJ "must provide an '*accurate* and logical bridge' between the evidence and the conclusion that the claimant is not disabled." *Id.* (emphasis added) (citations omitted).  There is no evidence that Ms. Baldock ever took an IQ test in 2008.  The Commissioner's argument that this factual error is harmless is unavailing for two reasons.  First, IQ evidence is pivotal in the determination of intellectual disability under Listing 12.05 because it is one of only two factors specific to Listing 12.05(C).  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 A.  Here, the ALJ made two distinct and significant mistakes when determined that Ms. Baldock did not meet the

9

requirements for Listing 12.05(C). The ALJ (1) used a non-existent set of IQ scores to determine whether or not Ms. Baldock possessed a qualifying score and (2) improperly concluded that the non-existent score set did not include a qualifying score, despite the fact that the set includes a score of 70.[14] [R. 15; dkt. 12-2 at 16.] Second, the ALJ afforded great consideration to this non-existent set of scores, which precludes a determination that the error was "de minimis."

### b. The ALJ Afforded Great Consideration to the Non-Existent IQ Score Set

Not only did the ALJ consider a set of IQ scores absent from the record, he stated that he "finds those scores more [*sic*] persuasive of claimant' [*sic*] actual intelligence" and proceeded to weight that non-existent score set heavily in balance against all other facts on the record.[15] [R. 15-19; dkt. 12-2 at 16-20.] The Commissioner unpersuasively argues that the 2008 set is "not substantially different" than Ms. Baldock's most recent and accurate IQ score set, collected in 2004, and that therefore the mistake should be thrown into the vat of harmless error. [Dkt. 20 at 6.] It is not harmless error that the ALJ considered a set of scores which create the impression that Ms. Baldock's IQ increased seven points overall in a span of three years.[16] None of Ms.

---

[14] Listing 12.05 requires one VIQ, PIQ, or FSIQ score of 60 *through* 70 and "a physical or other mental impairment imposing an additional and significant work-related limitation of function." [R. 214; dkt. 12-7 at 30.]

[15] For example, the ALJ noted that Mr. Weithe's "findings regarding [Ms. Baldock's] ability to follow instructions and deal with stress are inconsistent with her IQ scores and the fact that she is able to sit down and take a standardized test." [R. 17; dkt. 12-2 at 18.]

[16] The non-existent, 2008 set consists of the following scores: VIQ: 70, PIQ: 81, FSIQ: 74. [R. 208; dkt. 12-7 at 24.] In 2004, at age 29, Ms. Baldock's actual IQ scores were as follows: VIQ: 69, PIQ: 78, FSIQ: 71. [R. 187; dkt. 12-7 at 3.]

Baldock's IQ scores apart from the set collected in 2004 are considered "current."[17] *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(D)(10). Ms. Baldock has one set of valid adult IQ scores; therefore, there is no reason for the ALJ to have considered the scores collected when Ms. Baldock was a child, which are legally stale. *Cf. Johnson v. Astrue*, 2010 WL 1190123, at *5 (S.D. Ind. 2010) (affirming the ALJ's decision to accept the highest of the claimant's childhood IQ scores in part because the claimant did not have valid adult IQ scores).[18]

The Court finds that if the ALJ had considered an accurate record, one that omitted the non-existent 2008 score set, there is a reasonable probability he would have reached a different conclusion. Given the lack of accuracy in the bridge between the evidence and the ALJ's determination, in combination with the significant amount of weight the ALJ afforded the non-existent set of IQ scores, the Court is not confident that the ALJ would reinstate his decision on remand. Because it is evident from the ALJ's opinion that his analysis is founded on a non-existent set of IQ scores, and because Ms. Baldock's other challenges hinge in large part on errors stemming from the non-existence of this IQ evidence, the Court need not reach Ms. Baldock's other claims of error.

---

[17] IQ test results obtained between ages seven and 16 are only considered current for two years when the tested IQ is over 40. 20 C.F.R. pt. 404, subpt. P, app. 1, § 112.00(D)(10). Ms. Baldock was under 16 when she was tested every time prior to 2004 and every score within each of those sets prior to 2004 is over 40. Ms. Baldock's IQ scores are as follows. In 1984, at age nine: VIQ: 73, PIQ: 85, FSIQ: 77. [R. 197; dkt. 12-7 at 13.] In 1989, one day after her 15th birthday: VIQ: 58, PIQ: 74, FSIQ: 64. [*Id.*] In 1990, at age 15 years and six months: VIQ: 60, PIQ: 73, FSIQ: 65. [R. 194; dkt. 12-7 at 10.] In 2004, at age 29: VIQ: 69, PIQ: 78, FSIQ: 71. [R. 187; dkt. 12-7 at 3.]

[18] The ALJ opined that Ms. Baldock's "IQ have been [*sic*] improving," and he specifically noted the non-existent set of scores as an indicator of that improvement. [R. 15; dkt. 12-2 at 16.] This assessment is contrary to the nature of IQ scores. There is no reason for the ALJ to believe that Ms. Baldock has become more competent over time, nor is there justification for the ALJ to imply that Ms. Baldock's competency might continue to improve. IQ does not change over time, because it represents an individual's capacity to learn, not the knowledge an individual possesses. *Heller v. Doe by Doe*, 509 U.S. 312, 323 (1993) ("mental retardation is a permanent, relatively static condition").

### 4. The Standard for Remand versus an Order of Benefits

When an ALJ commits legal error or substantial evidence does not exist to support his decision, the Court must generally remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir.2005). Here, the ALJ erred in his determination that Ms. Baldock is not disabled because he considered a set of non-existent scores. The bridge the ALJ created between the evidence and his determination that Ms. Baldock is not disabled was therefore not "accurate," so the Court cannot conclude that substantial evidence exists to support his decision.[19] Accordingly, remand is proper.

While the Court has the authority to order an award of benefits on remand, "[a]n award of benefits is appropriate only where all factual issues have been resolved and the 'record can yield but one supportable conclusion.'" *Briscoe*, 425 F.3d at 355 (citations omitted). The Court does not find that this high threshold has been met. Therefore, the matter will be remanded to the ALJ for reconsideration consistent with this Entry.

### CONCLUSION

The ALJ's denial of relief is **REVERSED** and the case **REMANDED** for further proceedings consistent with this opinion.

07/10/2013

                                                     *[signature]*
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

---

[19] When considering a claimant's case record, "the ALJ is not required to mention every piece of evidence" on the record. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). However, the ALJ "must provide an '*accurate* and logical bridge' between the evidence and the conclusion that the claimant is not disabled." *Id.* (emphasis added) (citations omitted).

**Distribution via ECF:**

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

David F. Chermol
CHERMOL & FISHMAN, LLC
dave@ssihelp.us

Frederick J. Daley
DALEY DEBOFSKY & BRYANT
fdaley@fdaleylaw.com